**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| Paulette Price, Wendy O'Neil, Mary Dee Miller, and Helen Goebel, | Civil No. 09-1921 (DWF/LIB) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Northern States Power Company, | |
| Defendant. | |

___

Paul W. Iversen, Esq., and Richard A. Williams, Jr., Esq., Williams & Iversen, counsel for Plaintiffs.

Melissa Raphan, Esq., and Michael Iwan, Esq., Dorsey & Whitney, LLP, counsel for Defendant.[1]

___

**INTRODUCTION**

This case concerns claims of sex discrimination brought under the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d); the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A; and Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e, *et seq.* The matter is before the Court on a Motion for Summary Judgment brought by Defendant

___

[1] Plaintiffs originally sued Xcel Energy Services, Inc. and Northern States Power Company. Pursuant to the parties' stipulation, the parties both agree that Northern States Power Company is the only proper Defendant in this case. (Doc. Nos. 52 & 54.)

Northern States Power Company ("NSP"). For the reasons set forth below, the Court grants the motion.

## BACKGROUND

*Plaintiffs*

Paulette Price began working for NSP in May 1987; Wendy O'Neil began working for NSP in May 1990; and Mary Dee Miller began working for NSP in January 1990. Price, O'Neil, and Miller became Field Representatives in the Chestnut Service Center between January through February 1998. The Chestnut location covers the Twin Cities area, and it currently has 18 Field Representatives. During the time that Plaintiffs have been employed as Field Representatives at the Chestnut location, there have been three managers: Wayne Stifter (prior to mid-2007); Kelly Bergeron (mid-2007 to mid-2008); and Ben Hasselblad (mid-2008 to present).

Plaintiff Helen Goebel joined NSP in January 1982 in the St. Cloud Service Center. At all relevant times, the St. Cloud location had three Field Representatives, including Goebel's husband and Bob Burnett. Goebel became a Field Representative at the St. Cloud Center in October 1997. During her time as a Field Representative, Goebel has had three supervisors: Wayne Stifter (prior to mid-2006); Mary Preusser (mid-2006 to March 2008); Karen Jones (March 2008 to present).

*Field Representatives*

Although all Plaintiffs share the same job title, their duties differ based on the location of the offices and their training and experience. Field Representatives, who are sometimes called "collectors," perform bill collection and utility disconnect work. In

addition, they post notices, leave information for residents, install lockboxes, check for illegal connections, and report other service problems. Sometimes, Field Representatives develop and propose ideas for streamlining and completing projects. In the Chestnut location, Field Representatives also perform reconnections to reestablish power to a customer after that customer brings his or her account current. Some Field Representatives receive additional training and perform investigations concerning billing, meter, and rate issues. In the Chestnut location, only certain Field Representatives perform such investigations, but Price, O'Neil, and Miller do not, although they previously requested that they be trained to conduct investigations. In the St. Cloud location, all Field Representatives, including Goebel, perform such investigations.

Historically, NSP has not hired outside employees to be Field Representatives. Rather, the company moves existing employees into those positions. This means that all Field Representatives, including Plaintiffs, have an existing base compensation which they are allowed to keep when they begin working as Field Representatives, even if that causes certain Field Representatives to start the position with a higher base compensation than other Field Representatives.[2]

---

[2] NSP explains that either company policy or certain agreements with unions required them to allow an employee to retain his or her base salary, even if it was higher than that of other Field Representatives, when becoming a Field Representative. NSP refers to this practice as "red-circling." Red circling is the practice of lawfully maintaining higher than normal wage rates. *Dennis v. Dillard Dept. Stores, Inc.,* 207 F.3d 523, 525 n.2 (8th Cir. 2000); *see also* Plfs' Opp'n Mem. at 17 contained in Doc. No. 43 (acknowledging that this practice in and of itself is not discriminatory).

*Performance Evaluation Process*

Until September 2009, Field Representatives received increases in base compensation under a merit/performance-based system called Individual Performance and Development ("IPAD") administered by NSP supervisors and later approved by certain managers.[3] NSP explains that under IPAD, supervisors were expected to make ongoing observations regarding work performance and provide feedback on an informal basis. Supervisors gave formal, written IPAD evaluations to Field Representatives on a semi-annual basis. The evaluation considered NSP's goals, group goals, and individual goals, as well as other performance issues such as attendance, customer complaints, safety violations, and discipline instances. It also assessed each employee's attitude, teamwork, willingness to volunteer for end-of-day assignments, and the like. With respect to Field Representatives in particular, NSP explains that the IPAD rating was driven by a variety of factors, including statistics related to the amount of money collected and the number of disconnects, reconnects, and lockbox installations. NSP further explains, and Plaintiffs concede, that these statistics alone cannot be easily compared because the numbers must be viewed through a lens that considers the demographics involved in each Field Representative's territory.

---

[3] Since September 1, 2009, a new collective bargaining agreement ("CBA") between NSP and the union, of which Plaintiffs are a part of, dictates base compensation rates and increases for all Field Representatives. Plaintiffs' claims are directed at their pay before September 1, 2009. Interestingly, the CBA retains the existing pay rates for Field Representatives and uses a uniform percentage-based formula for pay rate increases in 2010.

The IPAD evaluation generated an overall numerical rating 1 through 5 for each employee.[4] Supervisors finalized each Field Representative's IPAD rating at the beginning of the next calendar year. When making decisions relating to how much each employee's base compensation percentage rate should increase, the IPAD rating served as the primary reference point for supervisors. Annual increase guideline ranges that corresponded to each IPAD rating were also developed, which were expressed in terms of upper and lower percentage increases. In this way, an employee's raise was primarily based on the IPAD score, which generated a certain percentage salary increase. An employee's raise was not tied in any way to that employee's base salary for a particular year.

## DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

---

[4] Prior to 2008, an IPAD rating of 1 was the best and 5 was the worst. In 2008, NSP reversed the order of the IPAD ratings, making a 5 the best and a 1 the worst.

'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

**I.     Equal Pay Act**

To make a prima facie case under the EPA, a plaintiff must prove that her employer discriminated on the basis of sex by paying different wages to men and women performing equal work under similar conditions at the same establishment. 29 U.S.C. § 206(d)(1); *Bearden v. International Paper Co.*, 529 F.3d 828, 833 (8th Cir. 2008). Equal work means work on jobs that requires equal skill, effort, and responsibility, and which are performed under similar working conditions. 29 U.S.C. § 206(d)(1); *Brown v. Fred's, Inc.*, 494 F.3d 736, 740 (8th Cir. 2007). To satisfy the equal work requirement of the EPA, the jobs need only be substantially equal, not identical. *Simpson v. Merchants & Planters Bank*, 441 F.3d 572, 578 (8th Cir. 2006).

If a plaintiff can establish a prima facie case under the EPA, an employer may avoid liability by establishing any of four affirmative defenses to explain differences in

wages: (1) a seniority system; (2) a merit system; (3) a system that measures earnings by quantity or quality of production; or (4) a differential based on any other factor other than sex. 29 U.S.C. § 206(d).

### A. Limitations Period

A two-year statute of limitations period governs EPA claims, unless there are claims of willfulness, which are not present in this case. *See* 29 U.S.C. § 255(a). Plaintiffs filed their original complaint on July 22, 2009. Given this, the earliest date for liability on Plaintiffs' EPA claims would be July 22, 2007. Plaintiffs do not necessarily dispute this date, but they nonetheless often focus their opposition on times when Wayne Stifler was a manager, which occurred prior to mid-2006. For this reason, the Court notes the importance of this date for the purposes of analyzing Plaintiffs' claims.

### B. Establishment

The EPA requires a plaintiff to establish a geographic or establishment component to support her prima facie case. Plaintiffs assert that a jury could conclude that all four plaintiffs work in the same establishment, despite the fact that Goebel works in the St. Cloud location and Price, O'Neil, and Miller work in the Chesnut location.[5] Plaintiffs base this argument on the fact that Wayne Stifter managed both locations from approximately 1998 through 2006 and made centralized decisions relating to supervision and compensation that impacted both locations. Plaintiffs assert that Stifter's decisions

---

[5] The record is not clear but it appears that some Field Representatives in the Twin Cities began working out of a center referred to as Centre Point after the 35W bridge collapse. This fact does not impact the Court's analysis.

7

then impact Plaintiffs' pay today. Plaintiffs further accuse Stifter of providing false information to Plaintiffs about IPAD ratings and whether they could receive extra training to do investigations. Plaintiffs, however, acknowledge that since 2006, the St. Cloud location has been supervised separately from the Chestnut location.

NSP responds by pointing out that the St. Cloud location is approximately 75 miles from the Chesnut location and that each location covers distinct geographic territories. Moreover, during the relevant limitations period, the supervisors at each location were different.

The United States Supreme Court has held that "establishment" means a "distinct physical place of business," as opposed to an entire business or enterprise. *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 496 (1945). The Secretary of Labor has adopted this interpretation for the purpose of administering the EPA. *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1464 (9th Cir. 1985); *see also* 29 C.F.R. § 1620.9(a) (defining establishment and explaining that "each physically separate place of business is ordinarily considered a separate establishment"). After reviewing the cases cited by the parties and viewing the evidence in the light most favorable to Plaintiffs, the Court agrees with NSP. The locations are physically distinct, under separate supervision, and have different salary decision-making authority. Given this, the Court concludes that there is no factual dispute that the Chesnut and St. Cloud locations are two different establishments for the purposes of the EPA.

## C. Individual Analysis of Plaintiffs' Claims

Defendants do not concede that Plaintiffs can establish a prima facie case for any of the Plaintiffs. Assuming that Plaintiffs can establish a prima facie case, Defendants further assert that there is no genuine issue of material fact with respect to Defendants' affirmative defense that wages were based on either a merit-based system or a differential other than sex. Plaintiffs respond that, at a minimum, "a reasonable jury could infer from these facts that the differential is not entirely due to factors other than sex." (Doc. No. 43 at 7.)

### 1. Chestnut Location

The following facts are relevant to an analysis of Price's, O'Neil's, and Miller's claims. There are 18 Field Representatives at the Chestnut location—the 3 female Plaintiffs and 15 male employees. When Plaintiffs became Field Representatives, they entered the positions at a red-circled base salary rate higher than two men (Ronald Sawtell and Steven Robinson) who had longer tenure as Field Representatives.

Plaintiffs Price and Miller moved from Meter Readers to Field Representatives together with six males—Brad Banks, Willie Bond, Mark LeDuc, Dan Myos, Greg Oldenburg, and John Ploof. The red-circling agreement with the Meter Reader union required that these eight individuals transfer to Field Representatives at the same base salary rate they had as Meter Readers. This means that Price and Miller began as Field Representatives with the same base salary rate as Greg Oldenburg and Brad Banks; at a higher rate than Willie Bond and Mark LeDuc; and at a lower rate than Dan Myos and John Ploof.

9

Plaintiff O'Neil transferred from a customer service position with Daniel Garvey, and, pursuant to NSP's policy, O'Neil and Garvey kept their existing red-circled base salaries. As a result, O'Neil's base salary when she began as a Field Representative was higher than Greg Oldenburg, Brad Banks, Ronald Sawtell, Willie Bond, Steven Robinson, and Daniel Garvey.

Three other males—Todd Erie, James Jechorek, and Jeffrey Robinson—became Field Representatives from other positions at NSP in 1999, 2002, and 2007, respectively. Again, their base salaries were red-circled, which resulted in Todd Erie and Jeffrey Robinson starting as Field Representatives with higher base salaries than Plaintiffs and most of the other male Field Representatives. James Jechorek started as a Field Representative with a base salary that was slightly lower than all of Plaintiffs' salaries.

Finally, three other males—Faron Jackson, David LeDouceur, and Dennis Young—moved from Meter Readers to Field Representatives in early 2009. Pursuant to a red-circling agreement with the Meter Reader Union, each of these males moved into the positions with higher base salary rates than Plaintiffs and other male Field Representatives.

During the relevant time period, Price, O'Neil, and Miller received IPAD ratings and raise percentage increases that were higher or better than most of the male Field Representatives. For instance, in 2008, O'Neil, Miller, and five males received a 4 IPAD rating. Of those, O'Neil and one male received a 5% raise increase, and Miller received a 4.9% raise increase. Also in 2008, Price and seven males received a 3 IPAD rating. Of those, Price received the fourth highest increase with a 3.3% raise increase. In 2009,

10

O'Neil and four males received a 4 IPAD rating. Of those, O'Neil received the highest increase with a 3.8% raise increase. That same year, Price, Miller, and the eleven other males received an IPAD rating lower than 4, which resulted in no raise.

To support their prima facie cases, Plaintiffs point generally to the dollar differences between their salaries of Plaintiffs compared to their male counterparts, without reference to a specific time period. According to Plaintiffs:[6]

- Four male Field Representatives initially making more than Price are still making more than Price, and the gap between them has increased, two Field Representatives initially making the same as Price are now making more than her, and five male Field Representatives who initially made less than Price now make more than Price.

- Three male Field Representatives initially making more than O'Neil are still making more than O'Neil, and the gap between them has increased, and three male Field Representatives who initially made less than O'Neil now make more than O'Neil. One male Field Representative, Mark Leduc, initially made $.08 per hour more than O'Neil, but now makes $.19 per hour less.

- Four male Field Representatives initially making more than Miller are still making more than Miller, and the gap between them has increased, two Field Representatives initially making the same as Miller are now making more than her, and three male Field Representatives who initially made less than Miller now make more than Miller.

(Doc. No. 43 at 4-6.) Plaintiffs acknowledge that the practice of red-circling is not discriminatory per se, and they acknowledge NSP was under no obligation to reduce the pre-existing gap in compensation between Plaintiffs and the male Field Representatives.

---

[6] Plaintiffs' summary includes employees from the St. Cloud location.

11

(*Id*. at 17.)  Nonetheless, Plaintiffs contend that there is a genuine factual dispute about the prima facie case because the gap between Plaintiffs' salaries and certain males who began with larger base salaries increased over time:  "This point is that the actual differential is more than the differential that can be explained simply by differences in starting pay alone."  (*Id*. at 18.)

Viewing this evidence in the light most favorable to Plaintiffs, the Court concludes that there is no genuine issue of material fact that Price, O'Neil, and Miller cannot establish a prima facie case under the EPA.  Moreover, assuming for the sake of argument that Price, O'Neil, and Miller could establish a prima facie case, the Court concludes that there is no factual dispute that NSP has met its burden with respect to its affirmative defenses concerning merit-based pay and another rationale based on something other than sex.

There is no dispute that all of the Field Representatives entered the positions at different starting salaries for legitimate reasons.  *See Dennis,* 207 F.3d at 525.  There is also no dispute that NSP could legally give percentage raises based on a merit-based system or another system based on factors other than sex.  *See Gaujacq v. EDF, Inc.*, 601 F.3d 565, 575 (D.D.C. 2010) (affirming summary judgment and explaining subjectivity is permissible in employment decisions provided that there are demonstrable reasons for the decisions that are unrelated to sex).  Price, O'Neil, and Miller cannot create a genuine issue of material fact by simply tabulating numbers without reference to starting salaries and IPAD ratings in and out of the limitations period.  Price, O'Neil, and Miller have

failed to make any attempt to compare themselves to male employees receiving the same IPAD ratings.

A mere widening of a pay gap, without more, is not evidence of discrimination. Here, a Field Representative's salary was tied to two things—his or her starting salary and the percentage raise he or she earned each year. If two employees legitimately started the position with different base salaries but earned the same percentage raise each year, as a result of compounding, the differences in their salaries would increase each year. This mathematical result, by itself, is not evidence of discrimination. In sum, construing the evidence in the light most favorable to Plaintiffs, the record before the Court shows the kind of pattern where the protected-class members sometimes do better and sometimes do worse than their comparators, which by itself is not evidence of discrimination. *See, e.g.*, *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 643 (7th Cir. 2008) (discussing age discrimination, which is analogous); *Coaker v. Home Nursing Serv., Inc.*, 1996 WL 316739 at *15 (S.D. Ala. 1996) (discussing claims of racial discrimination, which is analogous, and concluding that "[w]here some members of a protected class do better than members of the comparison class and some do worse, that is evidence of non-discrimination"). For these reasons, the Court grants NSP's motion with respect to Price's, O'Neil's, and Miller's EPA claims.

2. **St. Cloud Location**

As noted above, for the purposes of this EPA claim, the St. Cloud location is a separate establishment from the Chestnut location. In the St. Cloud location, there are three Field Representatives—Goebel, Tom Goebel (Goebel's husband), and Bob Burnett.

Goebel is the highest paid and highest rated Field Representative at the St. Cloud location. Given this, the Court grants summary judgment with respect to Goebel's EPA claim.

## II. Title VII and MHRA Claims

The parties agree that the Eighth Circuit has held that the EPA standards apply to Title VII discrimination claims of "unequal pay for equal work." *See, e.g., Taylor v. White,* 321 F.3d 710, 718-19 (8th Cir. 2003); *McKee v. Bi-State Dev. Agency*, 801 F.2d 1014, 1018 (8th Cir. 1986). Moreover, the parties agree that Minnesota courts look to Title VII case law to analyze MHRA claims. *See, e.g., Mems v. City of St. Paul, Dept. of Fire and Safety Servs.*, 327 F.3d 771, 785 n.11 (8th Cir. 2003). Given this and noting the shorter limitations periods applicable under Title VII and the MHRA, *see* 42 U.S.C. § 2000e-5 and Minn. Stat. § 363A.28, it follows that Plaintiffs' Title VII and MHRA claims must fail for the same reasons that the Court concluded that Plaintiffs' EPA claims fail.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1. NSP's Motion for Summary Judgment (Doc. No. [29]) is **GRANTED**.

2. The Amended Complaint (Doc. No. [6]) is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: January 31, 2011　　　　　　　s/Donovan W. Frank
　　　　　　　　　　　　　　　　　　DONOVAN W. FRANK
　　　　　　　　　　　　　　　　　　United States District Judge